## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

BRODERICK PATTERSON,                    *

Plaintiff                               *

v                                       *          Civil Action No. PWG-19-0833

OGUNBA, CO II,                          *
ICE, CAPT.
KELLEHER, LT.                           *
REED, LT.
WILLIS, LT.                             *
AKINPETIDE, CAPT.,
CHRIS ESSER,                            *
LAZARUS, LT., and
WARDEN ARMSTEAD,                        *
Defendants
                                        *
                                       ***

## MEMORANDUM OPINION

Self-represented plaintiff Broderick Patterson is a former Maryland inmate.  He alleges in this Complaint filed pursuant to 42 U.S.C. § 1983 that he was: sexually assaulted and harassed by prison staff; harassed and retaliated against for having filed a Prison Rape Elimination Act ("PREA") Complaint, which was also improperly processed; denied due process during his disciplinary hearing; improperly detained in a "bull pen" and prevented from seeing the psychiatrist; falsely accused in an inmate rule infraction; and denied his midday medication and other medical care while housed on disciplinary segregation.  Compl., ECF No.1. Defendants, Akinpetide, Armstead, Esser, Ice, Kelleher, Lazarus, Ogunba, and Reed,[1] filed a Motion to

---

[1] No correctional officer with the surname Willis was working at Patuxent at the time of the allegations in the Complaint. ECF No. 28-2, p. 1, n. 1 (Memorandum); ECF No. 28-5, p. 1, ¶ 5 (Coccagna-Graham Decl.); ECF No. 28-21, p. 2, ¶ 7 (Lazarus Decl.); ECF No. 28-23, p.21, ¶ 6 (Reed Decl.).  As such, Willis has not been served with the Complaint and the Complaint is dismissed as to Defendant Willis.  In his opposition response, Plaintiff states that in

Dismiss, or in the Alternative, for Summary Judgment.  ECF Nos. 28[2] and 62.  Plaintiff has filed opposition responses (ECF Nos. 59 and 72),[3] and Defendants filed a Reply.  ECF No. 60.

For reasons discussed below, the Court will construe Defendants Akinpetide, Armstead, Esser, Ice, Kelleher, Lazarus, Ogunba, and Reed's Motion as a Motion for Summary Judgment. Upon review of the papers and exhibits filed, the Court finds an oral hearing in this matter unnecessary.  *See* Local Rule 105.6 (D. Md. 2021).  Because the Court finds there are no genuine disputes of material fact, the Motion for Summary Judgment will be granted.  The Complaint is dismissed as to Willis.

## Background

### 1.  Plaintiff's Allegations

Plaintiff contends that on August 28, 2018, Officer Ogunba stopped him and asked to frisk him, searching for contraband.  During the frisk, Ogunba fondled Plaintiff's penis.  ECF No. 1-1, p. 1.  Several times in September of 2018, Ogunba ordered Plaintiff to "spread em" while he checked Plaintiff for contraband, all the time groping Plaintiff's genitals and rubbing against Plaintiff's buttocks. *Id.*  Throughout October and November 2018, Ogunba continued to grope Plaintiff's genitals. *Id.*

---

his original complaint he misspelled Lt. Higgins' name as Lt. Willis, and all references in his complaint to Willis, are intended as references to Higgins.  ECF No. 59-5.

[2] The Motion was denied without prejudice, subject to renewal, in order to provide Plaintiff an opportunity to view videos submitted in support of the Motion.  ECF No. 61. The Motion was renewed at ECF No. 62. Plaintiff has acknowledged that he viewed the videos.  ECF No. 67.

[3] Briefs in opposition to a dispositive motion may not be used to amend a complaint or add new claims.  *See Mylan Labs., Inc. v. Akzo, N.V.,* 770 F. Supp. 1053, 1068 (D. Md. 1991) (stating that "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss" (citation omitted)); *see also Zachair Ltd. v Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint" (citations omitted)), aff'd 141 F.3d 1162 (4th. Cir. 1998).  As such Plaintiff's claims regarding his 2005 arrest, length of his parole violation detention, new claims regarding overall processing of his ARPs, and threats not to return to Patuxent, each raised for the first time in his opposition response (ECF No. 59), shall not be considered.

In an affidavit attached to the Complaint, Plaintiff avers that Ogunba repeatedly grabbed his genitals and occasionally rubbed or groped his buttocks. ECF No. 1-8, p. 1.  Plaintiff avers that a number of these encounters occurred where there were no cameras.  *Id.*  As a result of these encounters, Plaintiff alleges that he has suffered "mental anguish, anxiety, emotional distress, and sleepless nights, and thoughts of hopelessness."  *Id.*  He contacted the PREA hotline and wrote grievances all to no avail.  As a result of filing the PREA complaint, he has encountered "major problems from staff at Patuxent Institution."  *Id.*

### A.  November 12, 2018 Incident

On November 12, 2018, Plaintiff admits he took a grapefruit from the dining room.  ECF No. 1-1, p.1.  While frisking Plaintiff, Ogunba groped him.  *Id.*  After the encounter, Plaintiff asked to speak to a supervisor and was escorted to Captain Ice and Lieutenant Wiggins, who threatened that if Plaintiff filed a PREA complaint he would regret it.  *Id.*, pp. 1, 5.  Plaintiff was then taken to the medical department by Lieutenant Kelleher for PREA screening. *Id.*, p. 1.  Lt. Kelleher listened to Plaintiff's report and then left the medical department.  *Id.*  Later, Plaintiff received an infraction for possessing the grapefruit and using vulgar language.  *Id.*  Plaintiff explains that no other inmates at Patuxent Institution received an infraction for bringing fruit out of the kitchen and alleges that the infraction was written in retaliation for his having filed the PREA complaint. *Id.*, pp. 1, 5. He claims that Lt. Kelleher violated his right to due process by not allowing him to request witnesses or sign the infraction.  *Id.*, pp. 1, 6.  Lt. Wiggins retaliated against him by threatening that if Plaintiff pursued the PREA complaint against Ogunba he would regret it.  *Id.*, p. 5.

On November 18, 2018, Plaintiff met with PREA investigator Captain Akinpetide, who assured him that he would not be harassed or retaliated against for having filed a PREA complaint and that Ogunba would stay away from him while the matter was investigated. ECF No. 1-1, p. 2.

Despite this assurance, "Ogunba continued to frisk, grope, fondle, caress, harass, and intimidate [Plaintiff]". *Id.*

On November 21, 2018, Plaintiff appeared for his disciplinary hearing, but the hearing was postponed pending the outcome of the PREA investigation.  ECF No. 1-1, p. 2; ECF No. 1-7.

Plaintiff states that he wrote to the Inmate Grievance Office (IGO) at the address provided in the Patuxent Institution inmate handbook, but the complaint was returned.  ECF No. 1-1, p. 2. Plaintiff alleges that the inmate handbooks provided to him included erroneous information regarding reporting of sexual misconduct and PREA, including that the address in the handbook for contacting the IGO was incorrect.  ECF No. 1-8, p. 1.

Plaintiff claims he filed a timely Administrative Remedy Procedure ("ARP") regarding these claims, but the ARP was dismissed by Warden Laura Armstead and Commissioner Wayne Hill. ECF No. 1-1, p. 2.  He alleges that Armstead failed to investigate or correct Ogunba's conduct.  *Id.*, p. 5.

On December 3, 2018, due to his deteriorating mental health, which he attributes to the repeated sexual assaults by Ogunba, Plaintiff was called to see the psychiatrist.  ECF No. 1-1, p. 2. He "was illegally detained in a bullpen and denied access to see [the] psychiatrist." *Id.*

**B.  December 5, 2018 Incident**

On December 5, 2018, Ogunba again grabbed Plaintiff's genitals. ECF No. 1-1, p. 2. Plaintiff's request to speak to a shift supervisor was denied.  He called the PREA hotline but was placed in a bullpen and detained for hours.  *Id.*

The following day, Plaintiff was called to see Lt. Lazarus.  ECF No. 1-1, p. 3. When he arrived, Lt. Lazarus, Lt. Reed, and Lt. Higgins, were present and each demanded the copy of Plaintiff's signed ARP from the previous day. *Id.*  Plaintiff refused to provide the copy and was

4

then advised that Lt. Higgins, not Captain Akinpetide, was the PREA representative. *Id*. Lt. Lazarus threatened to write a notice of inmate infraction and send him to lock up if he did not give her his copy of the PREA grievance. *Id*. Lt. Lazarus further stated that she had reviewed the video of the December 5, 2018 incident and did not see any sexual misconduct. *Id*.

Plaintiff claims that Lt. Lazarus wrote a false infraction on behalf of Ogunba, in retaliation for his having filed a PREA complaint. *Id*., pp. 3, 6.

He claims that Captain Akinpetide, Lt. Reed, and Lt. Willis were deliberately indifferent to Ogunba's sexually abusing him and they failed to take corrective action to stop the misconduct. ECF No. 1-1, p. 7.

Plaintiff's disciplinary hearing was held on December 21, 2018 before Officer Esser for both disciplinary infractions related to the PREA complaint. ECF No. 1-1, p. 3; ECF No. 1-7. He was found guilty of violating Rule 410, and pled guilty to violating Rule 315. *Id*. Plaintiff contends that he was denied his right to call witnesses. *Id*. He appealed the hearing officer's decision to the Warden but received no response. *Id*.

### C. Denial of Medical Care

From December 21, 2018 through January 4, 2019, while held on disciplinary segregation, Plaintiff was denied his midday medication for his "serious medical condition." ECF No. 1-1, p. 3. Plaintiff alleges that on thirteen out of fifteen days of his segregation confinement, custody staff did not escort him to medical to get his medication or medical treatment. *Id*.

On January 4, 2019, Plaintiff asked Officer Akinyeni to call medical for his midday medication but when Akinyeni called the medical department he was advised by Lt. Lazarus that there was no staff. ECF No. 1-1, p. 4. Plaintiff was not escorted to medical and he "suffered pain and suffering, cramps, physical injury, emotional distress." *Id*. Akinyeni logged the incident. *Id*.

Plaintiff alleges that Lt. Lazarus was deliberately indifferent to his need for medical access and medications.  ECF No. 1-1, p. 7.

### D.  Remedy Process

Ultimately, Plaintiff's PREA complaint was dismissed.  ECF No. 1-1, p. 4; ECF No. 1-5.  Plaintiff states that it was dismissed based on COMAR 12.02.28.04B(5)(A) which provides that inmates may not seek relief for PREA incidents through the ARP process.  *Id*.  Plaintiff contends this determination conflicts with Department of Public Safety and Correctional Services ("DPSCS") policy which allows that a PREA incident may be reported through the ARP process.  *Id*.; ECF No. 1-4.

### 2.  Defendants' Response

Defendants explain that Plaintiff arrived at Patuxent in August of 2018.  ECF No. 28-5, p. 1, ¶ 2 (Coccagna-Graham Decl.).  He had previously been housed at Maryland Reception, Diagnostic and Classification Center (MRDCC), where he was counseled by staff regarding PREA reporting options.   ECF No. 28-6, pp. 1-2, ¶¶ 1-6 (Bouldin Decl.); ECF No. 28-6, p. 3 (PREA/Intake Orientation Receipt).  Plaintiff was advised that he could report a PREA violation by either calling the PREA hotline, using an ARP form, or by speaking with staff.  *Id*. [4]

Sgt. Rajan met with Plaintiff for Patuxent inmate orientation.  ECF No. 28-7, p. 1, ¶ 2 (Rajan Decl.).  On September 24, 2018, Sgt. Rajan explained to Plaintiff about PREA protections and methods for reporting sexual abuse or harassment.  *Id*.  Sgt. Rajan gave Plaintiff the May 22, 2017[5] Patuxent Inmate Handbook, as well as brochures regarding PREA and sexual abuse.  *Id*., ¶ 3.  The handbook and brochures explained methods for reporting PREA violations, including that

---

[4] Plaintiff denies being shown any videos about PREA or signing for the PREA intake/orientation with Officer Bouldin.  ECF No. 59-6.

[5] The 2017 version of the handbook has the date on the bottom of each page.

an ARP form could be used to report a PREA violation in order to prompt an investigation. *Id.*, pp. 25-26, 51, 53 (Handbook and Brochures).  Plaintiff signed the PREA acknowledgement as well as the receipt for the inmate handbook.  *Id.*, pp. 3-5.

At that time, Sgt. Rajan conducted a PREA intake screening, and Plaintiff denied having ever been sexually assaulted or abused, including during his incarceration.  ECF No. 28-7, pp. 1-2, ¶¶ 3, 4 (Rajan Decl.); p. 6.  Prior to November 12, 2018, there was no indication in Patuxent records that Plaintiff notified anyone regarding concerns about PREA violations, including the allegations against Ogunba.  ECF No. 28-8, pp. 1-2, ¶¶ 1, 3, 6, (Ice Decl.); ECF No. 28-8, p. 7 (Serious Incident Report); ECF No. 28-7, p. 2, ¶ 6 (Rajan Decl.); ECF No. 28-7, p. 6 (PREA Intake Screening).

Defendants maintain, generally, that on each occasion that Ogunba caught Plaintiff with contraband, Plaintiff told staff that Ogunba groped his genitals during the encounter.  Staff reviewed surveillance video and determined that Plaintiff's claims were unsubstantiated, unfounded, and retaliatory.  Thereafter Plaintiff filed this case.

### A.    November 12, 2018 Incident

As to Plaintiff's specific allegations, on November 12, 2018, at approximately 7:30 a.m., Officers Sadiku and Ogunba were completing their assigned random searches of inmates who were returning from the Inmate Dining Hall (IDH).  ECF No. 28-9, p. 1, ¶ 3 (Ogunba Decl.); ECF No. 28-10, pp. 1-2, ¶ 5 (Sadiku Decl.)  Defendants explain that random searches of inmates are important to institutional safety and security and are used to prevent the common efforts of inmates to use contact during dining to transfer contraband and to remove fruit from the IDH to make alcohol in their cells.  ECF No. 28-9, p. 1, ¶ 4 (Ogunba Decl.); ECF No. 28-10, p. 1, ¶ 3 (Sadiku Decl.);  ECF No. 28-12, p. 1. ¶  2 (Armstead Decl.); ECF No. 28-8, p. 1, ¶ 4 (Ice Decl.); ECF No.

28-13, p. 1,  ¶ 4 (Akinpetide Decl).   Inmate use of alcohol increases the risk of assault which endangers both staff and other inmates.  ECF No. 28-9, p. 1, ¶ 4 (Ogunba Decl.); ECF No. 28-8, pp. 1-2, ¶ 4 (Ice Decl.).   Pat down searches of inmates are an efficient means of detecting contraband concealed by inmates.  ECF No. 28-8, pp. 1-2, ¶ 4 (Ice Decl.).

Sadiku completed the search of one inmate and Ogunba directed the next approaching inmate, which was Plaintiff, to step out of line to be searched.  ECF No. 28-5 (DVD filed separately), Video 1 at 7:49:08-10; ECF No. 28-8, p. 3, ¶ 12 (Ice Decl.); ECF No. 28-10, p. 1, ¶ 5 (Sadiku Decl.); ECF No. 28-9, p. 2, ¶ 6 (Ogunba Decl.).  Plaintiff, who appears both substantially taller and heavier than Ogunba, responded that he would not be searched, moved toward Ogunba aggressively, putting his face inches from Ogunba's, and shouted and cursed[6] at Ogunba.  ECF No. 28-5 (DVD filed separately), Video 1 at 7:49:12-25; ECF No. 28-9, p. 2, ¶ 6 (Ogunba Decl.); ECF No. 28-10, pp. 1-2, ¶ 5 (Sadiku Decl.); ECF No. 28-14,  pp. 4-5 (Brengle IID Report).  Plaintiff then walked away from Ogunba.  ECF No. 28-5, (DVD filed separately) Video 1 at 7:49:32; ECF No. 28-9, p. 2, ¶ 6 (Ogunba Decl.); ECF No. 28-10, p. 1, ¶ 5 (Sadiku Decl.).  Sadiku stopped Plaintiff and directed that he submit to the search by Ogunba.  ECF No. 28-5, (DVD filed separately) Video 1 at 7:49:34; ECF No. 28-10, pp. 1-2, ¶ 5 (Sadiku Decl.); ECF No. 28-9, p. 2, ¶ 6 (Ogunba Decl.).  Plaintiff walked toward Ogunba but again refused the order.  ECF No. 28-5 (DVD filed separately) Video 1 7:49:37-40; ECF No. 28-9, p. 2, ¶ 6 (Ogunba Decl.).  Plaintiff appeared to signal another inmate from the line and the other inmate stepped out of line and walked toward Ogunba.  ECF No. 28-5 (DVD filed separately) Video 1 at 7:49:41-46.  Plaintiff stepped behind Ogunba, adjusted his pants and shirt bottom and as he came back around Ogunba, the other inmate obeyed the officer's direction to leave.  ECF No. 28-5 (DVD filed separately), Video 1 at

---

[6] The videos are without sound. References to what was said are taken solely from the declarations.

7:49:43-50:3; ECF No. 28-9, p. 2,  ¶ 7 (Ogunba Decl.).  Eventually, Plaintiff submitted to a brief search.  ECF No. 28-5 (DVD filed separately) Video 1 at 7:50:09-13; ECF No. 28-9, p. 2, ¶ 8 (Ogunba Decl.); ECF No. 28-10, p. 1, ¶ 5 (Sidaku Decl.). Ogunba noticed Plaintiff's belt line was unnaturally lifted away from his waist, which he believed indicated a concealed object.  Ogunba stepped back and directed Plaintiff to surrender the object.  Plaintiff reached into his pants, retrieved a grapefruit, placed it on a nearby shelf, stepped away from the wall while adjusting his clothes, and then grabbed and shook his crotch up while spitting and yelling at Ogunba.  ECF No. 28-5 (DVD filed separately) Video 1 at 7:50:14-24; ECF No. 28-9, p. 2, ¶¶ 8-9 (Ogunba Decl.).

Captain Ice avers that Plaintiff's behavior exposed the officers to considerable danger and that Plaintiff's abusive and threatening conduct alone could have justified a strip search for additional contraband.  ECF No. 28-8, p. 3, ¶ 17 (Ice Decl.).  Instead, Ogunba directed Plaintiff to submit to a second pat-down for other contraband.  ECF 28-9, p. 2, ¶ 9 (Ogunba Decl.).  Rather than comply, Plaintiff shouted "Fuck you! Fuck you motherfucker.  I'll make sure you never work on my tier again."  ECF No. 28-9, p. 2, ¶ 9 (Ogunba Decl.); ECF No. 28-10, p. 2, ¶ 5 (Sadiku Decl.) and pp. 4-5 (Sadiku matter of record).  Plaintiff was then subjected to an additional three-second pat-down.  ECF No. 28-5 (DVD filed separately) Video 1 at 7:50:30-32; ECF No. 28-9, p. 2, ¶ 9 (Ogunba Decl.); ECF No. 28-10, p. 2, ¶ 5 (Sadiku Decl.).

Ogunba did not contact Plaintiff's groin or between Plaintiff's legs during either pat down.  ECF No. 28-5 (DVD filed separately) Video 1 at 7:50-10-13 and 7:50-30-32; ECF No. 28-9, p.  ¶ 11 (Ogunba Decl.); ECF No. 28-10, p. 2, ¶ 5 (Sadiku Decl.).  Ogunba and Sadiku deny that Ogunba said, "you sweet thing" to Plaintiff as alleged.  ECF No. 28-9, p. ¶ 11 (Ogunba Decl.); ECF No. 28-10, p. 2, ¶ 5 (Sadiku Decl.).  Ogunba and Sadiku directed Plaintiff to return to his housing unit.  ECF No. 28-9, p. 2, ¶ 10 (Ogunba Decl.); ECF No. 28-10, p. 2, ¶ 5 (Sidaku Decl.).  Plaintiff stated

that he wanted to speak to a supervisor in order to make a PREA claim and walked away. *Id.* Sadiku and Ogunba let him leave. *Id.*

After completing the mass movement search assignment, Ogunba reported the incident to Lt. Kelleher. ECF No 28-11, p. 1, ¶ 3 (Kelleher Decl.); ECF 29-9, p. 3, ¶ 12 (Ogunba Decl.). Based on Ogunba's report and a review of the video surveillance, Lt. Kelleher determined that Plaintiff's conduct risked escalating into a fray and that Plaintiff's behavior was uncharacteristic of inmates caught with fruit. ECF No. 28-11, p. 1, ¶ 3 (Kelleher Decl.). Kelleher, Ogunba, Sadiku, Ice, and Akinpetide explain that inmates generally know that if they surrender contraband they can move on without interference. ECF No. 28-11, p. 1, ¶ 3 (Kelleher Decl.); ECF No. 28-9, p. 2, ¶ 5 (Ogunba Decl.); ECF No. 28-10, p. 1, ¶ 4 (Sadiku Decl.); ECF No. 28-8, p. 3, ¶ 13 (Ice Decl.); ECF No. 28-13, p. 2, ¶ 5 (Akinpetide Decl.). In Kelleher, Akinpetide, and Ice's opinion, Plaintiff's escalation of the situation was a red flag. ECF No. 28-11, p. 1, ¶ 3 (Kelleher Decl.); ECF No. 28-13, p. 2, ¶ 5 (Akinpetide Decl.); ECF No. 28-8, p. 3, ¶¶ 15-17 (Ice Decl.).

Given the serious risk presented by Plaintiff's conduct and his possession of contraband, Lt. Kelleher agreed with Ogunba's recommendation and wrote and signed the Notice of Inmate Rule Violation, which she then gave to CO II Frazier to serve on Plaintiff. ECF 28-11, p. 1, ¶ 3 (Kelleher Decl.). Lt. Kelleher did not present the infraction to Plaintiff and denies refusing or directing others to refuse to let him sign the infraction, or to ask for witnesses and evidence as Plaintiff alleged. ECF 28-11, p. 1-2, ¶¶ 3-6 (Kelleher Decl.); ECF-28-15, p. 2, ¶ 4 (Frazier Decl.).

Frazier served Plaintiff with the Notice of Inmate Rule Violation on November 12, 2018 at 10:03 a.m. ECF No. 28-15, p. 1, ¶ 2 (Frazier Decl.); and p. 4 (Notice of Inmate Disciplinary Hearing). Plaintiff refused to sign the notice, and Frazier noted his refusal on the form. *Id.*, p. 1, ¶ 3; and p. 4. Frazier does not have a specific recollection of serving the papers on Plaintiff but

avers that it is his standard practice when serving such a notice to identify the document for the inmate, advise him that signing the document is not an admission of guilt but is a receipt and an opportunity to ask for witnesses and evidence, and to advise the inmate that if he does not write in any witnesses or evidence he would not have an opportunity to ask for them later.  *Id.*, p. 1, ¶ 2.

The Notice of Inmate Disciplinary Hearing states that a failure to list witnesses will result in the waiver of that right.  ECF No. 28-15, p. 4 (Notice).  At various times throughout his incarceration, Plaintiff was served with other notices of disciplinary hearing and had completed the forms to request witnesses or evidence.  *See e.g.* ECF No. 28-16, pp. 3, 6 (Notices).  Frazier reported to Lt. Kelleher that Plaintiff refused to sign the ticket.  ECF No. 28-11, p. 2, ¶ 6 (Kelleher Decl.).  Lt. Kelleher completed processing the ticket for the hearing.  *Id.*

On November 12, 2018, Plaintiff complained to Lt. Wiggins that Ogunba groped him during the pat down.  ECF No. 28-17, p. 1, ¶ 3 (Wiggins Decl.).  Wiggins escorted Plaintiff to meet with the Shift Commander, Captain Ice.  *Id.*, ¶ 4.  Wiggins remained while Ice interviewed Plaintiff, who admitted he had a grapefruit stuffed into the front of his pants and that Ogunba did not put his hands down Plaintiff's pants.  *Id.*, ¶ 4; ECF No. 28-8, p. 2, ¶ 5 (Ice Decl.).  Plaintiff stated in an accusatory tone that Ogunba is a homosexual.  ECF No. 28-8, p. 2, ¶ 6.  Plaintiff was given the opportunity to write a statement and Wiggins began to gather PREA forms.  ECF No. 28-17, pp. 2,  ¶¶ 4-6 (Wiggins Decl.) and p. 4 (Inmate Statement Form) and p. 6 (Summary of PREA allegation); ECF No. 28-8, p. 2, ¶ 8 (Ice Decl.).  Plaintiff refused to make a statement explaining, "I don't have to talk to you.  I'm going to get my people to take care of this!"  *Id.* Wiggins directed Officer Hebron escort Plaintiff to the medical department for a PREA examination.  ECF No. 28-17, p. 6 (Summary); ECF No. 28-8, p. 12 (Serious Incident Report). Hebron, not Kelleher, escorted Plaintiff to the medical department.  ECF No. 28-18, p. 1, ¶ 2

(Hebron Decl.) and p. 3 (Hebron Matter of Record); ECF No. 28-8, p. 12 (Serious Incident Report). Plaintiff reported his concerns to Registered Nurse Ayo Jimoh, who referred Plaintiff to a physician's assistant for a PREA consultation.  ECF No. 28-19, p. 2 (medical records).  Wiggins continued the investigation and report regarding Plaintiff's claims.  ECF No. 28-17, pp. 2-3, ¶¶ 7, 8, 9 (Wiggins Decl.).

At approximately, 10:03 a.m., Lt. Kelleher was walking near the officer's desk at the hospital post, where Plaintiff waited for his consultation with the physician's assistant.  ECF No. 28-11, p 2, ¶ 7 (Kelleher Decl.).  Plaintiff spoke loudly and advised Kelleher that he had changed his mind and wanted to sign the infraction ticket and ask for witnesses.  *Id*.  Kelleher told Plaintiff that the ticket was already processed and could not be reopened.  *Id*.  Nevertheless, Kelleher offered that Plaintiff could write a statement and gave him blank forms for doing so.  *Id*.  Plaintiff wrote a statement and gave it to Kelleher at 11:25, and Kelleher passed the statement along to Wiggins for the investigation. *Id*., ¶ 8.

Additionally, Plaintiff told Kelleher that he did not want the PREA examination, and she told him that if he did not wait for the physician's assistant his PREA claim would be negated. ECF No. 28-11, p. 2, ¶ 9 (Kelleher Decl.).  Plaintiff was seen by the physician's assistant at 12:12 p.m..  ECF No. 28-19, p. 3 (Medical Record).  That same day, Wiggins and Ice prepared a Serious Incident Report regarding Plaintiff's claims, which was sent to the Warden.  ECF No. 28-17, p. 3,  ¶ 10 (Wiggins Decl.) and pp. 8-10 (Serious Incident Report).

The following day, Wiggins completed her investigation and gave her report to Ice.  She found that "Broderick Patterson's [sic] PREA allegation [was] unsubstantiated."  ECF No. 28-17, p. 2 ¶ 7 (Wiggins Decl.) and pp. 5-7 (PREA Investigation Report).  She also advised Plaintiff, at approximately 7:10 a.m. that morning, that the investigation was completed, and his claim was

unsubstantiated. *Id.* She showed him the form, but he refused to sign it. *Id.*, ¶ 9 and p. 7 (Inmate Notification).

Captain Ice, a trained PREA investigator and Certified Criminal and Administrative Investigator continued his own investigation into Plaintiff's allegation and completed a Serious Incident Report. ECF No. 28-8, pp. 6-10 (Memorandum from Ice to Armstead). He also referred the matter to the Internal Investigation Division ("IID") for an independent investigation. *Id.*, p. 10. Ice concluded his investigation on November 13, 2018 and delivered his Memorandum and Final Report to the Warden's secretary. *Id.*, p. 20, ¶ 20 (Ice Decl.).

IID Detective Owens was assigned to investigate Plaintiff's PREA Claim. ECF No. 28-20, p. 1, ¶ 3 (Owens Decl.); ECF No. 28-14, pp. 2, 4-5 (IID Investigation). Owens asked Plaintiff to provide information so that he could investigate his complaint. ECF No. 28-20, pp. 1-2, ¶ 4 (Owens Decl.). Plaintiff's only response was "It's over with." *Id.* He never mentioned any other sexual misconduct by Ogunba or anyone else. *Id.* Plaintiff did not report the November 12 incident to Owens. *Id.*

## B.  **December 5, 2018 Incident**

On December 5, 2018, Ogunba was assigned to the Eastside of Patuxent to secure inmate mass movement in the stair way between the IDH and housing areas. ECF No. 28-9, p. 4, ¶ 18 (Ogunba Decl.). While standing in the stairwell with another officer and an inmate, Ogunba saw, through a doorway into the housing unit, that Plaintiff was standing with his arms extended in an unusual way, apparently holding something under his armpits. ECF No. 28-9, p. 4, ¶¶ 18-19 (Ogunba Decl.); ECF No. 28-5 (DVD filed separately) Video 2. Ogunba called out, ordering Plaintiff to surrender the objects. *Id.* Plaintiff walked from the housing unit into the stairwell, Ogunba stepped back to provide space, and Plaintiff placed an orange in Ogunba's hand. ECF No.

28-9, p. 4,  ¶ 19 (Ogunba Decl.); ECF No. 28-5, (DVD Filed Separately) Video 2 at 12:46:52-12:47:05.  Ogunba directed Plaintiff to surrender the other item, but Plaintiff disobeyed the order, walked away, closing the door to the tier, and threw the other orange in the trash.  ECF No. 28-9, p. 4, ¶ 19 (Ogunba Decl.); ECF No. 28-5, (DVD Filed Separately) Video 2 at 12:47:20.

As a result of this encounter, Ogunba wrote a report recommending that an infraction be issued to Plaintiff for possessing the contraband orange.  ECF No. 28-9, p. 4, ¶ 20 (Ogunba Decl.); ECF No. 28-5, p. 36 (Notice of Inmate Rule Infraction).  Ogunba gave the language for the infraction to Lt. Lazarus and authorized Lazarus to sign the infraction on his behalf.  ECF No. 28-9, p. 4, ¶¶ 20-21 (Ogunba Decl.); ECF No. 28-21, pp. 1-2, ¶¶ 4-6 (Lazarus Decl.). Lazarus wrote the infraction because Ogunba was called away to other duties.  She signed Ogunba's name for the report as Ogunba had authorized her to do and signed her own name as the Supervisor Reviewer.  She processed the ticket.  *Id.*  Plaintiff was served with the infraction, signed for it, and asked for a witness and evidence.  ECF No. 28-5, pp. 36-37 (Notice of Inmate Rule Infraction).

On December 5, 2018, Plaintiff filed ARP 25-19, claiming that during the December 5 incident, Ogunba "grabbed [Plaintiff's] genitals" "on the stairwell."  ECF No. 28-5, pp. 54-55.

In response to Plaintiff's ARP 25-19, an institutional investigation of the PREA claim immediately began.  ECF No. 28-5, pp. 61-63, 56-57; ECF No. 28-12, p. 2, ¶ 4 (Armstead Decl.); ECF No. 28-22, pp. 1-2, ¶¶ 3-8 (Higgins Decl.); ECF No. 28-23, p. 1, ¶¶ 3-5 (Reed Decl.). Lieutenants Higgins and Reed investigated the claims.  *Id.*

The video of the event, reviewed by the Court, demonstrates that Ogunba did not touch Plaintiff's genitals on the stairwell.  ECF No. 28-5 (filed separately), Video 2.  During their investigation of the complaint, Higgins and Reed attempted to interview Plaintiff, but he was hostile and told them, "Don't worry about it.  I got my people on it."  ECF No. 28-23, p. 1, ¶¶ 3-

4; ECF No. 28-22, p. 2, ¶ 5.  Plaintiff was asked to write an inmate statement, but his statement

simply said that he elected not to make a written statement.  ECF No. 28-5, p. 56.

Higgins and Reed watched the video of the interaction, and based on their investigation,

concluded that:

> When inmate Patterson reported the allegation of sexual misconduct against Officer
> Ogunba that allegedly occurred on November 12, 2018, it was after Officer Ogunba
> had written an infraction on inmate Patterson that same day for stealing oranges[sic]
> from the kitchen.  Inmate Patterson also refused to write a statement accounting the
> incidents that allegedly went on that day just as he did when Lt. Reed and I
> interviewed him.
>
> It is this writer's belief that inmate Patterson's two P.R.E.A. allegations against
> Officer Ogunba were in retaliation because of the infraction.

ECF No. 28-22, p. 2, ¶ 7 (Higgins Decl.) and pp. 6-7 (Higgins memo).

### C. **Medical Care**

Plaintiff filed ARP 694-19 alleging that on December 3, 2018, while he waited to see a

health care provider, Ogunba walked by and said, "good luck seeing the doctor."  ECF No. 28-5,

p. 66.  The ARP was dismissed as without merit, and the dismissal was affirmed on appeal.  *Id*.,

pp. 64-65.  Ogunba avers that he has no control over escorts of inmates to visit health care providers

and avers that he did not interfere with, hinder, or delay Plaintiff's access to health care.  ECF No.

28-9, pp. 4-5, ¶¶ 23-24.

Plaintiff filed ARP 47-19, on January 10, 2019, alleging that from December 21, 2018 to

December[7] 4, 2019, he was denied access to his midday medications and that on January 4, 2019,

Lazarus told Akinyemi to "stand by no staff."  ECF No. 28-5, pp. 96-97.  After investigation, the

ARP was dismissed as unsubstantiated.  *Id*., p. 88-95.  Further Officer Akinyemi and Lazarus each

deny having any conversation with Plaintiff or awareness that Plaintiff requested medical care or

---

[7] Plaintiff clarifies that this date was written in error, he intended to state that he was refused his midday medication
from December 21, 2018 to January 4, 2019.  ECF No. 59-3.

medications as alleged in the complaint.  ECF No. 28-28, pp. 1-2, ¶¶ 3-5 (Akinyemi Decl.); ECF No. 28-21, pp. 2-3, ¶¶ 9-11 (Lazarus Decl.).

Defendants each deny interfering with, delaying, or denying medical treatment for Plaintiff.  ECF No. 28-8, p. 4, ¶ 23 (Ice Decl.); ECF No. 28-9, pp. 4-5, ¶¶ 23-24 (Ogunba Decl.); ECF No. 28-10, pp. 2-3, ¶ 8 (Sadiku Decl.); ECF No. 28-11, p. 3, ¶ 12 (Kelleher Decl.); ECF No. 28-12, pp. 2-3, ¶8 (Armstead Decl.); ECF No. 28-13, p. 2, ¶ 7 (Akinpetide Decl.); ECF No. 28-21, p. 3,  ¶ 11 (Lazarus Decl.); ECF No. 28-22, p. 3, ¶ 13 (Higgins Decl.); ECF No. 28-23, p. 2, ¶ 7 (Reed Decl.).

D.  **Disciplinary Proceedings**

On November 21, 2018, Hearing Officer ("H.O.") Esser called case No. 2018-19, regarding the November 12 incident.  ECF No. 28-5, p. 25; ECF No. 28-24 (Transcript of Hearing).  Plaintiff stated he was denied the opportunity to sign the ticket or request witnesses.  ECF No. 28-24, p. 2.  He also offered to enter a plea and take cell restriction "cause I have to show where I was harmed in my complaint, uh, for further litigation. . . .".  *Id*.  H.O. Esser postponed the case. *Id*., p. 3.

The case was recalled by H.O. Esser on December 21, 2018.  ECF No. 28-5, p. 25; ECF No. 28-25 (Transcript of Hearing).  Plaintiff stated that Kelleher refused to let him sign the ticket or request witnesses but H.O. Esser noted the ticket was served by Frazier not Kelleher.  ECF No. 28-25, p. 4.  Plaintiff admitted Frazier, not Kelleher, served him with the notice, but nevertheless claimed Kelleher denied him the opportunity to request witnesses.  *Id*.  The hearing officer found that based on the documentary evidence, Plaintiff refused to sign the ticket and, therefore, waived witnesses and evidence.  *Id*., p. 4; ECF No. 28-5, p. 25; *see also* COMAR 12.03.01.17.B.  Plaintiff reiterated that, according to his lawyer, he needed to be found guilty and "get punished." ECF No. 28-25, p. 2.  Plaintiff then pled guilty to the contraband violation, but not to the charge of

16

disrespect, insolence, or use of vulgar language.  *Id.* p. 5; ECF No. 28-5, p. 26.  Plaintiff testified on his own behalf regarding the incident.  ECF No. 28-25, p. 4.  H.O. Esser found Plaintiff guilty of both charges and sentenced him to 15 days segregation and the loss of 10 good conduct credits. *Id.*, p. 6.  As Plaintiff did not have any credits to lose, his sanction was 15 days segregation. *Id.* ECF No. 28-5, p. 27.  Plaintiff appealed the sanction, but the Hearing Officer's decision was affirmed by the Warden.  ECF No. 28-5, pp. 31. 33-34.

On the same date, H.O. Esser called Case No. 2018-20, the infraction arising from the December 5, 2018 encounter.  ECF No. 28-5, p. 39; ECF No. 28-26 (Transcript of Hearing). Plaintiff claimed the ticket was false and that he did not have anything under his clothes.  ECF No. 28-26, p. 3.  He also reported that Ogunba sexually molested him and another inmate on the stairwell.  *Id.*  H.O. Esser dismissed the charge because the video evidence Plaintiff requested was not available at the time of the hearing.  *Id.*, p. 5; ECF No. 28-5, p. 40.  Despite the dismissal, Plaintiff appealed these findings as well.  ECF No. 28-5 p. 44.

### E.  Access to Administrative and PREA Process

Defendants explain that inmates may use an ARP form to bring PREA claims to the attention of DPSC, e.g., as a report for investigation. ECF No. 28-7, p. 51; ECF No. 28-12, p. 2, ¶ 4 (Armstead Decl.).  When an ARP is used by an inmate to report a PREA complaint, it prompts DPSCS investigators to evaluate whether there are any immediate safety concerns that need to be addressed.  ECF No. 28-12, p. 2, ¶ 4.  While a PREA claim may be reported and an investigation prompted by the submission of an ARP, the claim cannot be resolved through the ARP process. Other than prompting an investigation, PREA complaints filed using the ARP process are procedurally dismissed pursuant to COMAR 12.02.28.04.B(5).

As to Plaintiff's claim that he was not provided the correct information to contact the IGO, the record demonstrates that from November 16, 2018 to March 2019, Plaintiff successfully mailed 8 items to the IGO.  ECF No. 28-27, pp. 1-2, ¶ 3 (Hassan Decl.)  The address for the IGO listed in the Inmate Handbook given to Plaintiff was correct.  ECF No. 28-7, p. 28; ECF No. 28-12, p. 3, ¶ 9 (Armstead Decl.).  The 2017 Inmate Handbook issued to Plaintiff provided the correct address for the IGO as 6776 Reisterstown Road. ECF No. 28-7, p. 28; ECF No. 28-12, p. 3, ¶ 9.

## Standard of Review

Fed. R. Civ. P. 12(b)(6) provides for the dismissal of a complaint for "failure to state a claim upon which relief can be granted."  This rule's purpose "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Specifically, a plaintiff must establish "facial plausibility" by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id*. The court need not accept unsupported legal allegations, *see Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).  Well-pleaded facts as alleged in the complaint are accepted as true.  *See Aziz v. Alcolac*, 658 F.3d 388, 390 (4th Cir. 2011).  Factual allegations must be construed "in the light most favorable to [the] plaintiff."  *Adcock v.*

*Freightliner LLC*, 550 F.3d 369, 374 (4th Cir. 2008) (quoting *Battlefield Builders, Inc. v. Swango,* 743 F.2d 1060, 1062 (4th Cir. 1984)).

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  The moving party bears the burden of showing that there is no genuine issue as to any material fact.  However, no genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof.  *Celotex*, 477 U.S. at 322–23.  On those issues on which the nonmoving party has the burden of proof, it is his responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.  In *Anderson v. Liberty Lobby, Inc.,* the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  477 U.S. at 249 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*. at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."  *Id*. at 252.

In this inquiry, a court must view the facts and the reasonable inferences drawn "in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson*, 477 U.S. at 252. This Court has previously held that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citation omitted).

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448–49 (4th Cir. 2012). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names,* 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56. Courts place greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party," such as "complex factual questions about intent and motive." *Harrods*, 302 F.3d at 244 (quoting 10B Wright, Miller & Kane, Federal Practice & Procedure § 2741, at 419 (3d ed. 1998)) (internal quotation marks omitted).

Although Plaintiff attempts in his opposition response to dispute some of the facts established by Defendants, he does so by making speculative assertions without providing any

evidence to substantiate these assertions. On a motion for summary judgment, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: . . . citing to particular parts of materials in the record, including [but not limited to] depositions, documents, electronically stored information, [and] affidavits or declarations[.]" Fed. R. Civ. P. 56(c)(1)(A).

Moreover, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Accordingly, Plaintiff's facts were only credited to the extent that he provided evidence to support them. In addition, Plaintiff's affidavits (ECF No. 59 attachments), were credited to the extent that the facts were based on his personal knowledge.

### Discussion

### 1. Eleventh Amendment Official Capacity Claims

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State." Sovereign immunity accords States the dignity that is consistent with their status as sovereign entities. *Fed. Mar. Comm'n v. S. Carolina State Ports Auth.*, 535 U.S. 743, 760 (2002).[8]

The Eleventh Amendment bars suit in federal court against a State by its own citizens, absent consent or a valid Congressional abrogation of sovereign immunity. *See Coleman v. Court of Appeals of Maryland*, 566 U.S. 30, 35 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that

---

[8] The Eleventh Amendment did not create sovereign immunity; rather, it preserved the sovereign immunity that the States enjoyed prior to the formation of the Union. *See Alden v. Maine*, 527 U.S. 706, 724 (1999); *see also Sossamon v. Texas*, 563 U.S. 277, 284-85 (2011).

defense."); *Board of Trustees of Univ. of Alabama v. Garett*, 531 U.S. 356, 363 (2001); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States." (internal quotation marks and citation omitted)); *Pennhurst State School and Hospital v Halderman*, 465 U.S. 89, 100 (1984).

Under Eleventh Amendment jurisprudence, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself."  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).  Therefore, official capacity claims are subject to sovereign immunity under the Eleventh Amendment.  *Kentucky v. Graham*, 473 U.S. 159, 167 (1985); *accord Hafer v. Melo*, 502 U.S. 21, 25 (1991).  As the Supreme Court explained in *Graham*, 473 U.S. at 165: "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law.  Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.,* 436 U.S. 658, 690, n. 55 (1978)) (citations omitted); *see also*, *e.g.*, *Huggins v. Prince George's Cty.*, 683 F.3d 525, 532 (4th Cir. 2012) (treating suit against individuals in official capacity as suit against county).  Therefore, States and their officers, sued in their official capacities, are not "persons" subject to suit for money damages under 42 U.S.C. § 1983.  *Will*, 491 U.S. at 71.

Sovereign immunity precludes a private individual not only from suing an unconsenting State in federal court, but also extends to an instrumentality of a State (also referred to as an "arm of the state"), absent waiver or Congressional abrogation.  In *Pennhurst State School & Hospital*, 465 U.S. at 101-02, the Court said: "It is clear, of course, that in the absence of consent a suit in

which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Id.*, *see also Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013).

The State of Maryland has waived its sovereign immunity for certain types of cases brought in State courts. *See* Md. Code Ann., State Gov't. Art., § 12–201(a). But, it has not waived its immunity under the Eleventh Amendment to a suit of this kind in federal court.

To be sure, there are several exceptions to the Eleventh Amendment bar. *See, e.g., Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 107 n. 13 (4th Cir. 2011) (listing exceptions). For example, the Eleventh Amendment does not prevent private individuals from bringing suit against State officials for prospective injunctive relief or declaratory relief for ongoing violations of federal law. This record, however, does not support any claim of ongoing unconstitutional conduct on the part of corrections personnel. Therefore, each individual defendant is entitled to dismissal with regard to claims against them in their official capacities.

### 2.  Sexual Assault/Processing of PREA Claim

"Section 1983 itself creates no rights," but rather "provides a method for vindicating federal rights elsewhere conferred." *Kendall v. City of Chesapeake*, 174 F.3d 437, 440 (4th Cir. 1999) (quoting *Albright v. Oliver*, 510 U.S. 266, 271 (1994)); *accord Doe v. Broderick,* 225 F.3d 440, 447 (4th Cir. 2000). "[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Gonzaga Univ. v. Doe,* 536 U.S. 273, 286 (2002).

Here, Congress intended with the enactment of the PREA "[t]o provide for the analysis of the incidence and effects of prison rape in Federal, State, and local institutions and to provide information, resources, recommendations, and funding to protect individuals from prison rape." PREA, Pub. L. No. 108-79, 117 Stat. 972 (2003). To the extent that Plaintiff is alleging that the

Defendants violated the PREA, the Court finds that he has no standing to bring such a claim, either as a direct action under the PREA or under 42 U.S.C. §1983. Under the statute, the primary purpose of the PREA was to: (1) establish standards for detection, prevention, reduction, and punishment of prison rape; (2) increase the available data and information on the incidence of prison rape and the accountability of prison officials who fail to detect, prevent, reduce, and punish prison rape; and (3) protect inmates' Eighth Amendment rights. *See* 42 U.S.C. § 15602, *et seq.* PREA was enacted to study the problem of prison rape and to provide the funding and expertise, *e.g.* review panels and commissions, to address the problem. There is nothing in the PREA which suggests that it was intended to create a private cause of action, independent from any complaint alleging violation(s) of the Constitution of the United States. *See Pirtle v. Hickman*, No. CV05–146–S–MHW, 2005 WL 3359731, *1 (D. Idaho Dec. 9, 2005).

Moreover, § 1983 serves as a mechanism to protect federal rights, not just violations of federal law. As stated by the Supreme Court:

> A court's role in discerning whether personal rights exist in the § 1983 context should therefore not differ from its role in discerning whether personal rights exist in the implied right of action context . . . . Accordingly, where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action.

*Gonzaga University v. Doe*, 536 U.S. 273, 285-86 (2002). Nothing in the PREA suggests that Congress intended to create a private right of action for prisoners to sue for non-compliance. *See Williams v. Dovey*, No. DKC-15-1891, 2016 WL 810707, at *7 (D. Md. Mar. 2, 2016) (citing cases).

Notwithstanding the absence of an independent cause of action under PREA, permitting the gratuitous sexual assault of inmates is not an acceptable practice under the Eighth Amendment's prohibition of cruel and unusual punishment. To establish an Eighth Amendment

claim, there must be evidence that the prison official subjectively "acted with a sufficiently culpable state of mind" and that the injury or deprivation inflicted was objectively serious enough to constitute a violation. *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). "Although prisoners have a right to be free from sexual abuse, whether at the hands of fellow inmates or prison guards, *see Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000), the Eighth Amendment's protections do not necessarily extend to mere verbal sexual harassment." *Austin v. Terhune*, 367 F.3d 1167, 1171 (9th Cir. 2004).

"[T]here can be no doubt that severe or repetitive sexual abuse of an inmate by a prison officer can be 'objectively, sufficiently serious' enough to constitute an Eighth Amendment violation." *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Sexual abuse of an inmate by a prison official has no legitimate law enforcement or penological purpose and those actions alone may meet the subjective element of an Eighth Amendment claim. *See id.* (citing *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992)). However, when the claim alleges incidents that are not "severe enough to be 'objectively, sufficiently serious'" and "the incidents [are not] cumulatively egregious in the harm they inflicted" no Eighth Amendment claim is stated. *Boddie*, 105 F.3d at 861 (citing *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994)). Here, Plaintiff's claims involving offensive touching are belied by the video evidence and fall far short of the egregious type of harm prohibited by the Eighth Amendment. Plaintiff's claim, refuted by the documentary evidence, does not satisfy either the objective or subjective elements of an Eighth Amendment claim, and Defendants are entitled to summary judgment in their favor. Plaintiff's assertions are without substantiation and are directly refuted by the Ogunba and Sadiku's declarations. Although the Court cannot resolve conflicting affidavits on summary judgment, Plaintiff's contentions are at odds with the DVD. *See*

*Witt v. West Virginia State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir.2011) (stating that "when a video 'quite clearly contradicts the version of the story told by [the plaintiff] ... so that no reasonable jury would believe it, a court should not adopt [the plaintiff's] version of the facts for purposes of ruling on a motion for summary judgment.'") (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

Further, insofar as Plaintiff is raising a failure-to-protect claim under the Eighth Amendment, the Court finds that he has failed to adduce evidence establishing deliberate indifference on the part of Defendants.[9]  Based upon the Complaint allegations and record exhibits, the evidence shows that: Plaintiff complained about threats of harm from Ogunba, and Patuxent staff immediately acted so that an investigation could be conducted.  They interviewed officers present during the alleged incidents, reviewed video of the interactions, and attempted to interview Plaintiff.  Plaintiff was uncooperative during the investigation, and the video evidence belied his allegations regarding Ogunba.  Ultimately, staff determined that Plaintiff's claims were made in retaliation for Ogunba having charged him with disciplinary rule infractions.  Staff did not disregard his claims of threats of harm and no viable constitutional violation has been presented in the record before the Court.[10]

---

[9]     To meet the standard for establishing a failure-to-protect claim under the Eighth Amendment, a prisoner must project evidence that a prison official "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Rich v. Bruce,* 129 F.3d 336, 339-40 (4th Cir. 1997).

[10]     To establish a claim under § 1983 for failure to protect from violence, an inmate must show "serious or significant physical or emotional injury," *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003). Although he seeks compensatory damages, at no point in time does Plaintiff allege that he suffered a physical injury. The Court further observes that the PLRA states that "no federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e).  It is settled law that a prior physical injury is required for a prisoner to recover damages for emotional and mental injury. *See Siglar v. Hightower*, 112 F.3d 191, 193-94 (5th Cir. 1997).

### 3. Verbal Threats and Harassment

To the extent Plaintiff claims that Defendants verbally harassed and threatened him, his claims are unavailing. Verbal abuse of inmates by guards, without more, states no claim of assault. *See Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979); *see also Carter v. Morris*, 164 F.3d 215, 219, n.3 (4th Cir. 1999) (rejecting use of racial epithets as a basis for constitutional claim). However, a threat of harm combined with action apparently designed to carry out the threat may state an Eighth Amendment claim. *Hudspeth v. Figgins*, 584 F.2d 1345, 1348 (4th Cir. 1978). It also may state a claim of denial of access to courts if threats were intended to intimidate an inmate from exercising that right. *Id*.; *see also Russell v. Oliver*, 552 F.2d 115 (4th Cir. 1977).

Plaintiff's allegations that Defendants Lazarus, Reed and Higgins demanded that he turn over copies of his ARP and that Ice threatened he would regret filing a PREA claim are simply unavailing, as Plaintiff has failed to allege much less demonstrate any harm arising from the conduct alleged. Defendants each deny Plaintiff's claims, and the undisputed record demonstrates that both Plaintiff's ARP and PREA allegation were fully processed and investigated and resolved in accordance with established procedures.

### 4. Disciplinary Charges

To the extent Plaintiff alleges that he was falsely accused of wrongdoing when he was issued inmate rule infractions after his encounters with Ogunba, his claims fail. Principally, Plaintiff has no constitutionally protected right from being falsely or wrongly accused. *See Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). Moreover, Plaintiff's contention that Lazarus falsified the infraction regarding the December encounter because she signed for Ogunba, is not supported by the record given that Lazarus was specifically authorized by Ogunba to sign his name when he was called away for other duties.

To the extent Plaintiff contends he was denied due process during his disciplinary proceedings, his allegation is not supported by the record.  Prisoners retain rights under the Due Process Clause, but prison disciplinary proceedings are not part of a criminal prosecution, and the full array of rights due a defendant in such proceedings does not apply.  *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (citing *Morrissey v. Brewer*, 408 U.S. 471, 488 (1972)).  In prison disciplinary proceedings where an inmate faces the possible loss of diminution credits, he is entitled to certain due process protections.  These include: (1) advance written notice of the charges against him; (2) a written statement of the evidence relied on and the reasons for taking any disciplinary action; (3) a hearing where he is afforded the right to call witnesses and present evidence when doing so is not inconsistent with institutional safety and correctional concerns, and a written decision; (4) the opportunity to have non-attorney representation when the inmate is illiterate or the disciplinary hearing involves complex issues; and (5) an impartial decision-maker.  *See Wolff*, 418 U.S. at 564-66, 592.  There is no constitutional right to confront and cross-examine witnesses or to retain and be appointed counsel.  *See Baxter v. Palmigiano*, 425 U.S. 308, 322 (1976); *Brown v. Braxton*, 373 F.3d 501, 504-05 (4th Cir. 2004).  Provided that the hearing officer's decision contains a written statement of the evidence relied upon, due process is satisfied.  *See Baxter*, 425 U.S. at 322, n.5.  Moreover, substantive due process is satisfied if the disciplinary hearing decision was based upon "some evidence."  *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455 (1985); *Tyler v. Hooks*, 945 F.3d 159, 171 (4th Cir. 2019) ("the 'some evidence' standard is extremely broad in scope and presents a very low burden for prison officials to meet.")  Federal courts do not review the correctness of a disciplinary hearing officer's findings of fact.  *See Kelly v. Cooper*, 502 F. Supp. 1371, 1376 (E.D. Va. 1980).  The findings will only be disturbed when unsupported by any evidence, or when wholly arbitrary and capricious.  *See Hill*, 472 U.S.

at 456; *see also Baker v. Lyles*, 904 F.2d 925, 933 (4th Cir. 1990); *Tyler v. Hooks*, 945 F.3d at 171-72.  If there is some evidence in the record to support a disciplinary committee's factual findings, a federal court will not review their accuracy.

Here, Plaintiff received all the process he was due in regard to both infractions at issue.  As to the November incident, he received advanced written notice of the infraction, waived his right to present evidence, and the Hearing Officer's findings were based on some evidence.  While Plaintiff contends that he was denied the right to call witnesses or present other evidence, the evidence before the Court, and the finding of the Hearing Officer, supports a finding that Plaintiff waived his right to call witnesses or present evidence. Further, Plaintiff does not explain what evidence he would have presented and, given that the video evidence presented to this Court contradicts Plaintiff's version of events, it is difficult to determine what evidence he could have mustered at the infraction hearing.  Additionally, Plaintiff pleaded guilty to the contraband charge during his hearing and indicated his desire to plead guilty so he could be sanctioned and pursue this case.  Nevertheless, even if Plaintiff were denied the right to present evidence at the hearing, the hearing did not result in the loss of good conduct credits, as Plaintiff had no credits eligible to be revoked, and he, therefore, received all the process he was due.

As noted, federal courts do not review the accuracy of a disciplinary hearing officer's findings of fact, and the findings will only be disturbed when unsupported by any evidence, or when wholly arbitrary and capricious.  Thus, so long as there is some evidence in the record to support a disciplinary committee's factual findings, a federal court will not review their accuracy. H.O. Esser considered the evidence presented and concluded that Plaintiff refused to sign the ticket, thereby waiving his right to call witnesses.  Esser also concluded that Plaintiff was guilty

of both charges, based on the evidence in the sworn rule infraction and on Plaintiff's own testimony.

Regarding the December incident, there is no dispute that Plaintiff received advanced written notice of the infraction/hearing, was permitted to present evidence, and received the Hearing Officer's written decision, which dismissed the infraction because the video evidence Plaintiff requested was not available at the time of the hearing.

In short, Plaintiff received all the process he was due in regard to both disciplinary proceedings and Defendants are entitled to summary judgment on this claim.

### 5.  Retaliation

Plaintiff's claim—that he was issued inmate rule infractions in response to his filing PREA complaints and/or ARPs—is most fairly construed as a claim that he suffered retaliation for exercising his First Amendment right to petition for the redress of grievances. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).  To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that: (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," "incarceration does not divest prisoners of all constitutional protections."  *Shaw v. Murphy*, 532 U.S. 223, 228–29 (2001).  "[A]

30

prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Specifically, the Fourth Circuit has held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. *Booker v. S.C. Dep't of Corr.,* 855 F.3d 533, 545 (4th Cir. 2017).

A plaintiff can establish retaliatory conduct if the defendant took an action that "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (internal quotation marks and citations omitted). A plaintiff must also demonstrate a causal connection between his First Amendment activity and the alleged retaliatory action. *See Constantine*, 411 F.3d at 501. The showing can be based on circumstantial evidence, such as evidence that the defendant was aware of the First Amendment activity and that the retaliatory act was temporally proximate to that activity. *Id.*

Plaintiff must allege specific facts that support the claim that the conduct was retaliation rather than a legitimate act of discipline. *White v. White*, 886 F.2d 721, 724 (4th Cir. 1989) (discussing general rule that plaintiffs must allege with specificity facts to support their claims). The infractions issued to Plaintiff were justified based on Plaintiff's conduct as captured on the videos that were presented to the Court. Moreover, Plaintiff's initial PREA allegation was not filed until after his November exchange with Ogunba when it was clear that he was receiving a rule infraction for the exchange. Investigators of Plaintiff's allegations found that it was Plaintiff, not Ogunba, who leveled allegations of wrongdoing as retaliation for the other's actions. Defendants are entitled to summary judgment as to Plaintiff's retaliation claims.

### 6.  Supervisory Liability

Plaintiff alleges that Defendants Ice and Akinpetide failed to correct Ogunba's alleged misconduct.  Plaintiff asserts that they were "supervisory deliberately indifferent" to the alleged repeated sexual abuse, failed to correct same, and encouraged the conduct to continue.  He also claims that Warden Hill denied his ARP regarding the November 12, 2018 incident and failed to correct Ogunba's conduct.  He alleges that Commissioner Hill also denied his ARP regarding the November incident.  Plaintiff's theory of liability as to Defendants Ice, Akinpetide, Armstead, and Hill is premised exclusively on the doctrine of respondeat superior.

It is well established that the doctrine of respondeat superior does not apply in § 1983 claims.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (explaining that there is no respondeat superior liability under § 1983).  Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"  *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).  Thus, supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to, or tacit authorization of, the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.  *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Such evidence is lacking in this case.  First, Plaintiff's sole allegation regarding Akinpetide is that he told Plaintiff the PREA investigation would last 90 days.  Notwithstanding Plaintiff's apparent mistaken understanding that the PREA investigation would be completed and that he would be informed about the results within 90 days, Plaintiff has failed to allege any facts that could give rise to an inference that Akinpetide had actual or constructive knowledge of the misconduct alleged in this case and failed to take appropriate action.

Similarly, Plaintiff's allegations against Ice, Armstead and Hill are insufficient to support supervisory liability under § 1983.  If anything, he alleges facts demonstrating that Defendants properly supervised their subordinates.  Further, decisions by correctional staff considering inmate complaints without more does not establish personal participation in the alleged constitutional violation.  *See Atkins v. Maryland Div. of Correction*, Civil Action No. PWG–14–3312, 2015 WL 5124103 at *6 (D. Md. Aug. 28, 2015) (act of denying grievances); *Scott v. Padula*, C/A No. 0:08–3240–HFF–PJG, 2010 WL 2640308, *3 (D. S.C. June 14, 2010) (failure to investigate or process a grievance); *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) ("[A] denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983").  As such, Plaintiff's claims against Armstead are subject to dismissal.

Thus, the Court will grant summary judgment in favor of Ice, Akinpetide, Armstead, and Hill as there is no evidence that these Defendants were aware of, authorized, or displayed indifference concerning the misconduct alleged in this case.

### 7.  Denial of Medical Care

Plaintiff's claims that Ogunba said "good luck seeing the doctor," and he was not provided medical care from December 21, 2018 through January 4, 2019, fail.

To establish an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Courts treat an inmate's mental health claims just as seriously as any physical health claims." *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) (citing *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977)). There is no distinction between the right to medical care for physical ills and its psychological and psychiatric counterpart. *Bowring*, 551 F.2d at 47.

Assuming Ogunba uttered the phrase as alleged, there is no allegation or evidence that Ogunba prevented Plaintiff from being seen by medical staff. Moreover, Ogunba denies interfering with Plaintiff's medical care or having any authority to do so.

Regarding, Plaintiff's allegation that on January 4, 2019, he requested Akinyeni to call medical regarding his midday medication, and Akinyeni reported that Lazarus advised that there was no staff to escort him, while Lazarus and Akinyemi deny the events occurred as alleged, Plaintiff has failed to allege or demonstrate that he had a serious medical condition or that either Defendant was subjectively aware that his failure to receive his medication on that day created a risk of harm.

As to Plaintiff's claim that he failed to receive his midday medication while he was housed on segregation, he has failed to allege that any of the named Defendants were aware that he required daily midday medication, appreciated a risk of harm arising from not receiving the medication, and/or failed to act. Each of the named Defendants specifically deny hindering, delaying, or interfering with Plaintiff's health care. Defendants are entitled to summary judgment as to Plaintiff's medical claims.

### 8. Administrative Remedy Procedures

Plaintiff contends that the dismissal of his PREA ARP was improper as the brochure he was provided advised that inmates may use the ARP to report a PREA incident.  He also contends that the Patuxent Inmate Handbook provides the wrong address for the IGO.  Plaintiff is mistaken, and he is not entitled to relief on these claims.

To the extent Plaintiff claims his ARPs were improperly processed and dismissed, "inmates have no constitutional entitlement or due process interest in access to a grievance procedure." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017) (discussing *Adams v. Rice*, 40 F.3d 72 (4th Cir. 1994) ); *see Robinson v. Wexford*, No. ELH-17-1467, 2017 WL 4838785, at *3 (D. Md. Oct. 26, 2017) ("[E]ven assuming, arguendo, that defendants . . . did not satisfactorily investigate or respond to plaintiff's administrative grievances, no underlying constitutional claim has been stated" because "'inmates have no constitutional entitlement or due process interest in access to a grievance procedure.'") (quoting *Booker*).  If Plaintiff's intention is to assert that Defendants violated state policies, procedures, rules, regulations, or state law, the mere violation of State law or regulation does not provide a basis for a due process violation.  *See, e.g. Baker v. McCollan*, 443 U.S. 137, 146 (1979); *Riccio v. Cty. of Fairfax, Va.,* 907 F.2d 1459, 1469 (4th Cir. 1990) ("[i]f state law grants more procedural rights than the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue").

Plaintiff's allegation that he was provided the wrong address to submit grievances is not supported by the record.  The 2017 handbook given to Plaintiff has the date on the bottom of each page and provides the correct IGO address.  The evidence also demonstrates that Plaintiff filed at least eight complaints with the IGO during the relevant time, at the correct address. Further, Plaintiff's reporting of a PREA complaint via an ARP, generated an investigation of his Complaint

as that process was designed to do.  Accordingly, any due process claim Plaintiff seeks to raise in connection with the processing of his ARPs is without merit.

### 9.  Injunctive Relief

Plaintiff seeks an Order that the Patuxent Handbook be updated to reflect the correct address of the IGO as well as correct PREA reporting options.  While the evidence demonstrates that the information Plaintiff seeks to have added to the handbook is already present and provided to inmates, the injunctive relief request is also moot as Plaintiff has been released from confinement.

"'[A] case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *United States v. Hardy,* 545 F.3d 280, 283 (4th Cir. 2008) (quoting *Powell v. McCormack,* 395 U.S. 486, 496 (1969)). "'The inability of the federal judiciary to review moot cases derives from the requirement of Art. III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy.'" *Id.* (quoting *DeFunis v. Odegaard,* 416 U.S. 312, 316 (1974)).  An actual controversy must exist at all times while the case is pending.  *See Steffel v. Thompson*, 415 U. S. 452, 459 n.10 (1974). Where developments occur during the course of a case which prevent the court from being able to grant the relief requested, the case must be dismissed.  *See Flast v. Cohen*, 392 U.S. 83, 95 (1968). Indeed, "[w]here on the face of the record it appears that the only concrete interest in the controversy has terminated, reasonable caution is needed to be sure that mooted litigation is not pressed forward, and unnecessary juridical pronouncements on even constitutional issues obtained…"  *See Lewis v. Continental Bank* Corp, 494 U.S. 472, 480 (1990).  "[O]ne such circumstance mooting a claim arises when the claimant receives the relief he or she sought to obtain through the claim."  *Friedman's Inc. v. Dunlap*, 290 F.3d 191, 197 (4th Cir. 2002) (citing

*Broughton v. North Carolina*, 717 F. 2d 147, 149 (4th Cir. 1983).  The request for injunctive relief is denied as moot.

## Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment.  A separate order follows.


September 13, 2021                     _____/S/_____
Date                                  Paul W. Grimm
                                      United States District Judge